GEORGE E. DONNER ET AL., Plaintiffs, *v.* THE DAYTON AND CINCINNATI RAILROAD COMPANY, Defendant.

A railroad company, chartered by special act of the legislature, empow ering the directors, among other things, to transact all the business of the company and to sell and convey real and personal estate, and the right to complete any part of the road and put it in operation which the interests of the road may require, and having a choice of several routes and termini, may sell and convey to a competent vendee a portion of its right of way upon which no work has been done for a money consideration, and in satisfaction of its mortgage indebtedness on its whole line leaving to its creditors the part of its road-bed, upon which the bulk of its means has been expended.

Such a sale and conveyance are not *ultra vires*, and the corporation is not thereby destroyed.

The vendee of this right of way having acquired and enjoyed all its benefits shall not afterward be allowed to foreclose the mortgage, though he still holds the bonds which the vendor is entitled to have canceled.

The mere fact that the property of the corporation was in the hands of a receiver at the time of the sale, can not affect the transaction if *bona fide*.

RESERVED FROM SPECIAL TERM.—In February, 1847, 1848, and 1849, the legislature passed several acts by which the Dayton and Cincinnati Railroad Company became incorporated. It was known generally as "The Short Line Railroad," and is so designated. It had power to construct a

road from Dayton to Cincinnati, though in the first two acts it was called by other names, and was authorized to construct roads with different routes and termini. The board of directors was made "competent to transact all the business of the corporation," and to issue and sell bonds, etc., and made capable "to have, purchase, receive, possess, sell, convey, and enjoy real and personal estate," etc., and the right to complete any part of the road and put it in operation which the interests of the road may require to be first completed.

The company was duly organized, located its road, and commenced work in 1852, and in April, 1853, a mortgage upon the entire line from Dayton to Cincinnati for $1,000,000 was made to Wm. J. McAlpin and Peter Odlin, trustees, to secure the bonds of the company to that amount, and seventy-two of them for $1,000 each were sold or disposed of in the same year. It appeared that about $700,000, obtained principally from stock subscriptions, had been expended within three miles of Cincinnati, chiefly on what is known as the Short Line Tunnel, and that this was about the whole expenditure of the company in the construction of the road.

The company became insolvent and unable to proceed with the work. Donner and others, plaintiffs, owned thirty-eight of the mortgage bonds of the company, and brought suit, in May, 1859, to foreclose the mortgage and obtain payment of these bonds, and on motion a receiver was appointed to take charge of the unfinished road and other property of the company, and the plaintiffs obtained judgment and execution in 1860 for nearly $44,000. To the action sundry judgment and other creditors were made parties, who filed answers and cross-petitions, and, among other things, sought to subject unpaid stock subscriptions to the payment of their judgments.

In this state of affairs, the Cincinnati, Dayton and Eastern Railroad Company, known as the "Eastern Road" and so designated for convenience, became the owners by

assignment from the plaintiffs and others, both of the judgment they had obtained and also of the bonds of the Short Line Company, upon which the judgment was founded, to the number of sixty-five, in all $65,000, and accrued interest. Donner had no decree for sale at the time, but was pressing his claim in judgment againt the Short Line Company, while other creditors by judgment to a large amount were doing the same, the company being utterly insolvent, as is alleged. It appears that on the 28th July, 1865, the Short Line Company, upon the previous action of the board of directors appointing two of the members of the board for that purpose, by written agreement and conveyance to the Eastern Company, reciting its ownership of the right of way it had acquired, and other rights for the side tracks, depots, stations, etc.; that it had been engaged at·work chiefly near Cincinnati, where it had expended a large amount of money arising from stock subscriptions; that it had incurred liabilities for borrowed money, existing in part in its mortgage bonds, *secured on its entire road and property;* and that proceedings in foreclosure to sell the road were pending, and it had not the means or credit to complete the road, but was in imminent danger of having its *entire road sold* under the proceedings aforesaid, in consideration of $55,000 cash received, and of further covenants, sold and conveyed all its right, title, and interest in and to so much of the right of way, roadbed and ground appropriated or intended for side tracks, depots, stations, and other appurtenances of the same, in its full length and breadth, as extends and is situate in and from the city of Dayton, in the county of Montgomery, to the town of Sharon, in the county of Hamilton, including all its said line and appurtenances, situate and lying between said termini in Dayton and Sharon; and also the right to locate, construct, maintain, and operate, for the exclusive and perpetual use of said party (the Eastern Company), its successors and assigns, a single or double track of rails on and along that part of the right

of way and road-bed of the Short Line Company which extends from the town of Sharon to the point where said roadway intersects the road of the Marietta and Cincinnati Railroad Company. "It is expressly understood, nevertheless, by both parties to this indenture, that the same is not intended, or to be construed, to pass or include the capital stock of the Short Line Company, or any part thereof, whether paid or unpaid, or the franchises of the Short Line Company, or the residue of its right of way or its other property not hereinbefore granted, but the same are reserved and retained by the Short Line Company."

The agreement referred to in the indenture bears date the same day, and provides, in addition to the consideration of the $55;000 cash paid as set forth in the deed above recited, that the Eastern Company shall keep the Short Line Company, in so far as regards the directors, stockholders, and all the franchises and property not included in that conveyance, harmless and indemnified against the payment, or liability to pay, or be made answerable upon, the mortgage bonds of the Short Line Company, and interest, whether in judgment or otherwise, then owned and held by the Eastern Company, to the amount of $65,000, naming and numbering them: "It being understood that neither the said bonds, or the interest, or the coupons thereon, or the judgment rendered on them, or the mortgage by which they are secured, are in any manner paid or satisfied in whole or in part by this contract; but the same are to remain in full force, capable of being at any time made operative and available, either to protect and confirm by sale or otherwise the title" of the Eastern Company "to the right of way and appurtenances hereby sold, or in case of the failure of the title conveyed by said," the Short Line Company, "as herein stipulated, then to become fully operative against the said," the Short Line Company, "and all its property and franchises, in as full and ample a manner as if this contract had not been made." Upon the happening of the same contingency of

failure of title, the agreement provided for the repayment, or security therefor, of the $55,000 paid as part consideration of the conveyance. The $55,000 paid in money, it is alleged, were distributed among the creditors of the company.

Upon this security, the Eastern road, in November, 1866, issued mortgage bonds to the amount of $2,000,000, few of which are outstanding, the balance having never been negotiated. But the Eastern Company shortly afterward turned over all its rights in the agreement and property conveyed to it by the Short Line Company to the Sandusky road, which, by reason thereof, as the testimony shows, has made a running arrangement at a considerable profit with the Cincinnati, Hamilton and Dayton Railroad Company, which is operating a line of road from this city to Dayton by way of Hamilton, and, as may be supposed, the Eastern Company does not intend to do anything with the property it owns by virtue of this conveyance from the Short Line Company.

In this suit various entries were made and proceedings had, until in March, 1870, a decree for sale was entered in behalf of the Cincinnati, Dayton and Eastern Company, on the bonds held by it, and motion was made to set the same aside. It seems an appraisement of the property mortgaged was made, under an order of sale, issued at $270,000, but an order was entered staying proceedings until the determination of the motion to set the decree for sale aside, which was afterward done.

*J. W. Coleman et al.,* stockholders in the Short Line Company, owning nine hundred and sixty-six shares, shortly after the consummation of this sale, viz: on the 16th October, 1865, brought an action in this court to set aside the conveyance and to restrain the Eastern Company from doing anything under it. While this suit was pending, the majority of the stockholders of the Short Line Company executed a paper, in which they state that the plaintiffs in that suit do not represent the subscribers to the paper, and

that "they approve of the sale and desire that the same shall be in all things confirmed, and are ready to give their assent in any form. They are satisfied that said sale was necessary and judicious, and they regard it as highly beneficial to the stockholders and creditors of the said Short Line Company."

In this case both corporations filed an answer in 1865, in which they both allege that the plaintiffs represent the only stock out of eight thousand four hundred and fifty-nine shares opposed to the sale, and they both ask the court to affirm it.

On a hearing of the cause, in April, 1867, a temporary restraining order was allowed in this cause, on the plaintiffs executing bond in $1,000, which was never done; and on the 19th March, 1870, a final decree in favor of the plaintiffs was entered, and a motion to set that decree aside duly made, and afterward granted.

In 1869, Richard Mathers and Samuel Beresford, executors of George Mathers, deceased, filed a creditor's bill upon a judgment they had obtained against the Short Line Company, and alleged the same was a lien on all its property, and upon which they had levied an execution. To this action the plaintiffs made the Eastern Company and the other creditors parties. They allege that the sale to the Eastern Company was void, and asked a marshaling of liens and a sale of the property of the Short Line Company. To this petition, among other answers, is one filed by the Eastern Company, on February 20, 1870, in which its ownership of sixty-six of the mortgage bonds of the Short Line Company, including those in the Donner judgment, is set up, the provisions of the mortgage to McAlpin and Odlin stated, the priority of the lien asserted, and prays that in case any sale is made that its rights may be ascertained and determined, and the amount of its bonds and interest be first paid out of the proceeds of the sale and other relief. Nothing is said in this answer about the contract, the sale and conveyance to this defendant by the Short Line

Company of July 28, 1865, or of the fact that it had, before this answer was filed, disposed of all its interest in that agreement and purchase to the Sandusky road.

To this answer a reply is filed, that the effect of the sale and conveyance by the Short Line Company to the Eastern Company, on July 28, 1865, was to satisfy and pay said mortgage bonds held by the Eastern Company as it alleges.

No answer appears to be filed by the Short Line Company in this case.

At the April term, 1870, these causes on motion were consolidated, and then, at the January term, 1871, came on for hearing, and the causes, together with the testimony taken before the judge at the trial, were reserved to this court.

It appears further, from the testimony, that immediately on the completion of the agreement of sale by the Short Line Company to the Eastern Company, that it set about resurveying the line from Sharon to Dayton, changed the route in some places, surrendered the old rights of way and took new ones, and took new stock subscriptions from the holders of stock in the Short Line Company which was surrendered, and was about to contract for the building of the line, when, as it alleges, the injunction allowed in the Coleman case stopped the project, and made it necessary to abandon the enterprise; but before that time the Eastern Company had become merged in the Sandusky Company, which, by means of this property, made a very advantageous running contract with the Cincinnati, Hamilton and Dayton Company. It was the imminence of the contract to build this road that brought the Cincinnati, Hamilton and Dayton Company to terms. Rush R. Sloane was and still is the president of the Eastern Company, as he claims, and as such holds the sixty-six bonds of the Short Line Company, payment of which is demanded. He is, and has been, also the president of the Sandusky road, which has reaped and is now reaping all

the very profitable advantages, larger than its cost, of having held the property of the Short Line Company as a means of obtaining its entrance into Cincinnati over the Cincinnati, Hamilton and Dayton Company much cheaper than the construction of an entrance of its own.

*Burnett & Follett; R. B. Warden,* and *Durbin Ward,* for the Dayton and Cincinnati Railroad Company.

*Champlin* and *Judge Caldwell,* for Coleman, Evans, et al.

*Caldwell, Coppock & Caldwell,* for the judgment creditors.

*King, Thompson & Avery,* for subscribers to the original stock.

*Tilden & Maxwell* and *Ware & Disney,* for the Cincinnati, Dayton and Eastern Railroad Company, and the holders of the bonds of the Dayton Short Line.

HAGANS, J.   The contract, sale, and conveyance of July 28, 1865, as between the Short Line Company and Eastern Company must be held binding and valid.   It does not appear well that the Eastern Company, after insisting in two answers that the contract is valid and binding, and having in the meantime given the Sandusky Company the benefit of the same, by which it has obtained a very valuable advantage, larger than its cost, should come, in the same action in 1870, and set up the mortgage bonds, and ask that they be paid again by a sale of all the corporate property and franchises of the Short Line Company, and by consequence be entitled to recover back the $55,000 cash which it had paid for the property it has enjoyed and is now enjoying, and which has long since been distributed to the creditors of the Short Line Company.   If there were nothing more in this case than this, we should hold it to be equitable to deny a sale on the prayer of the Eastern Company to satisfy these bonds.

Again, the contract provides that only in the contingency of failure of title to the part of the property conveyed, the Eastern Company may set up this claim. In any other case the bonds were to be used to make the conveyance operative and available. It would be unjust to allow it to so use and reap the advantage of the property embraced in the contract, as to make it the interest of this company to demand and insist upon a sale of the entire corporate property of the other party to the contract, as though the title to the property conveyed had failed, which has not occurred. We prefer to make these bonds operative and available, according to the contract, as to the property conveyed, and leave the parties where, by the contract, they have placed themselves, and to hold the conveyance and subsequent use of the property as substantially a satisfaction thereof. The propriety of so holding is sustained by the acquiescence of both companies for a period of some four years.

The cause of *Coleman et al.*, however, fairly presents the question of the validity of the contract of July 28, 1865.

It will be observed that this contract embraces only the corporate property of the Short Line Company, and expressly excludes the capital stock, the franchises of the company, the residue of the right of way and other property of the company. It is admitted that the Short Line Company had expended mainly all its means on the three miles of its line, including the great tunnel near and in this city, and was unable to proceed with the work, was largely in debt, was harassed with suits of judgments and taxes to a large amount, which it was unable to pay, and that its creditors, knowing the practical insolvency of the corporation, were pressing for payment and threatening to sell the whole property, which must have resulted in a fatal sacrifice and loss to the proposed road. The embarrassments surrounding the enterprise at the time were insurmountable. The directors of the company, to rid them-

selves of the most pressing of these demands, to save that portion of the property which was the most valuable to all parties, because the most of its means had been expended there, by this sale made with the assent of all its stockholders except these parties, in fact, preserved the enterprise from ruin, and paid off one hundred and twenty-one thousand dollars of debts, leaving still in the hands of the company the only available and valuable property it ever had. The proceeds of the sale went to the creditors of the road. The sale was unquestionably highly advantageous to the stockholders and other creditors of the company. The transaction presents, therefore, a strong claim that it should be upheld.

It is objected that this sale was destructive of the company. We do not think there is much force in this objection. The corporation is certainly not extinct. It may be that the Short Line Company may yet have the power to build its road to Dayton by another route, as the charters may give it such an option. It may even repurchase very cheap from the Eastern or the Sandusky Company the property sold, or its use, which, as it now asks a sale, appears to have no value to it. The conveyance of the right of way was not the grant of a franchise, but of one of the means by which a franchise may be enjoyed and passed by the conveyance. The Eastern Company, it is admitted, had the unquestionable right to obtain what it did; for it has a franchise to construct and work a road from Dayton to Cincinnati, and there is no reason why it may not purchase a right of way of the Short Line Company as of individuals. The right of way was simply a perpetual easement, and all the conditions upon which it was originally obtained were neither defeated nor violated. (*Junction R. R. Co.* v. *Ruggles*, 7 Ohio St. 1; *Coe* v. *Col. & Ind. R. R. Co.*, 10 Ohio St. 384; 1 Redfield on Railways, 247–251.) Besides, by the charter, the company had the right "to commence, complete, and put in opera-

tion any part of said railroad." The disposition of this property does not therefore destroy the enterprise.

An examination of the charter of the Short Line Company shows that it had the necessary power to obtain the right of way and to make the conveyance in the form and manner it did. (2 Redfield, 692.) But it is again objected that the whole matter was done by the board of directors. Besides the general power of the directors over the corporate property conferred expressly by its charter, we think the Supreme Court of Ohio has settled this question in the cases of *Hatch* v. *The Cin. & Ind. R. R. Co.*, 18 Ohio St. 92, and *Goodin* v. *Evans*, 18 Ohio St. 167 where this point was made by counsel in the argument. In the first of these cases, the grantee was not complaining of the transaction on that ground; so here the Eastern Company can not complain, as we have seen. In the second of these cases, the power of the board of directors of the Short Line Company, under that clause of its charter which empowers the directors "to transact all business of the corporation," passed under review. And it was held that the board of directors might, without referring the question to the stockholders, accept the provisions of section 14 of the act of 1848, by which they had taken subscriptions of real estate to its capital stock, though they had no right to take such subscriptions under the original charter. Adapting the language of the Supreme Court in that case to this, we may well say: "From the nature and character of this sale, there would seem to be no necessity for referring the question of sale to the stockholders. The disposition of the corporate property was not intended by the legislature to be confided to the individual corporators, but to the corporate body. The charter states that the directors shall be "competent to transact all business of the corporation." This sale, then, was business of the corporation, which the directors were made "competent to transact." It would seem that the stockholders could not have sold and transferred this

property. No one was competent to do it but the board; at least, if the stockholders could do it so might the board; and this would seem to be conclusive that this contract was not *ultra vires*. The subsequent assent and acquiescence of all the stockholders, except those joining Coleman in this suit, representing but a very small minority, furnish strong reason for declaring this sale to be valid, as undoubtedly the transaction was to the great advantage of all the creditors of the corporation. And certainly, if the board had the power to contract, it was their duty to sell, under the circumstances shown in the testimony, if thereby they could at once satisfy the most clamorous of the creditors, and pay their claims, and still have all that was really valuable in the enterprise as far as they had carried it.

But it is said the property of the Short Line Company was in the hands of the receiver of this court. Having found that this contract was not illegal, we do not see how the mere fact that the property of the corporation was in the hands of a receiver can affect it. While he represents the rights of both creditors and stockholders, he can only assert them when they are affected by the fraudulent or illegal acts of the board of directors, and may repudiate illegal transfers of property by the directors acting in the name of the corporation. (Edwards on Receivers, 141.) The other judgment creditors are entitled to a decree in their favor against the unsold property of the company; and the cause will be remanded for further proceedings to subject the unpaid stock subscriptions.

A number of cases were cited to us in argument, but we find nothing fairly opposed to the views we have expressed, and a decree may be taken accordingly.